

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*United States Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

August 8, 2016

**BY ELECTRONIC MAIL and ECF**
Honorable Kenneth M. Karas
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

      Re:   **United States v. Anthony Grecco**,
              14 Cr. 760 (KMK)

Dear Judge Karas:

      The Government submits this letter in connection with the sentencing of defendant Anthony Grecco, scheduled for August 10, 2016 at 2:30 p.m.  For the reasons set forth below, the Government respectfully submits that the Court should sentence the defendant to imprisonment for the remainder of his life, which is the sentence recommended by the United States Sentencing Guidelines.

## Background

      The facts of this case are well known to this Court, which presided over the trial of the defendant in January of this year.  Those facts can be briefly summarized as follows:

      In about 2008 or 2009, Anthony Grecco and his brother, Joseph Grecco, began growing and distributing marijuana in the state of Oregon.  They sold marijuana in Oregon to individuals who were licensed under state law to possess and consume it, but they also sold it illegally to individuals both within Oregon and outside of the state, including states such as Nevada, Arizona, California, and New York.  Beginning in about 2012, Grecco began driving large quantities of marijuana cross-country from Oregon to the East Coast.  Generally he drove about 50 pounds at a time.  One of his primary marijuana customers was Ryan Ennis, who lived in Ossining, New York.  Ennis purchased marijuana in bulk from Grecco and resold it to marijuana users in the area around Ossining.

      In late 2013, Grecco relocated from Oregon to New Jersey.  He moved because he had been stopped by law enforcement in Nebraska during a drug run.  Although he did not have drugs in the car at the time, he was carrying $82,020 in drug proceeds.  Grecco moved to New

Jersey, and instead of driving marijuana cross-country, had his brother ship marijuana to him via Federal Express in multi-pound increments.

By late summer 2014, however, Grecco's marijuana supply had dried up and he became desperate for cash. Grecco set up a meeting with Ennis, on the pretense that he would be bringing more marijuana for Ennis. In fact, Grecco intended to rob Ennis, and kill him if necessary, in order to get money. He wanted that money not only because he was strapped for cash, but because he intended to invest in Sean Ingram's heroin distribution business, which was based in New Jersey. In preparation for the meeting with Ennis, Grecco obtained a knife and stuffed a backpack full of linens so that Ennis would not realize that Grecco had arrived without any marijuana.

On August 26, 2014, Grecco drove with Ingram and Andrea Beatty from New Jersey to an apartment complex in Ossining, where Ennis was waiting in his father's apartment, alone. Grecco made clear to Ingram and Beatty in the car on the way to Ossining that he intended to rob Ennis and that he might kill Ennis. After arriving in Ossining, while Ingram and Beatty waited outside, Grecco went into the apartment and robbed Ennis. In the course of the robbery, Grecco stabbed Ennis repeatedly and slashed his throat, slicing through his carotid artery and killing him. Ennis's head was partially severed from his body. Grecco took $8,900 – the cash that Ennis had prepared for the marijuana deal – as well as a cellphone and a hat, from Ennis.

After the murder, Grecco returned to New Jersey with Beatty and Ingram. With Beatty and Ingram's assistance, Grecco showered and threw away the blood-stained clothes that he had been wearing in an attempt to cover his tracks.

Grecco then gave Ingram $1,500 of the money taken from Ennis as an investment in Ingram's heroin business. The understanding was that Ingram would purchase and sell about 25 grams of heroin per week on behalf of himself and Grecco. The plan was for some of the profits to be reinvested in the business indefinitely, and the remaining profits to be split between Grecco and Ingram. The conspiracy was cut short when, three weeks into the arrangement, Ingram was arrested on state drug charges in September 2014.

## The Charges and the Trial

Grecco was taken into federal custody on November 4, 2014. On December 14, 2015, a grand jury in this District returned indictment S6 14 Cr. 760 (the "S6 Indictment"). The S6 Indictment charged Grecco in five counts. Counts One and Two charged Grecco with robbing and conspiring to rob Ryan Ennis, in violation of Title 18, United States Code, Section 1951. Count Three charged Grecco with conspiring to distribute and possess with intent to distribute marijuana, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(D). Count Four charged Grecco with conspiring to distribute and possess with intent to distribute heroin, in

violation of Title 21, United States Code, Sections 846 and 841(b)(1)(C).[1]  Count Five charged Grecco with murdering Ryan Ennis, in violation of Title 18, United States Code, Section 1952.

  Grecco's trial on the allegations in the S6 Indictment began on January 11, 2016.  The trial concluded on January 22, 2016, after the jury returned a verdict of guilty on all counts.

  The trial evidence included powerful testimony from two cooperating witnesses: Andrea Beatty and Sean Ingram, who themselves pled guilty to aiding and abetting the robbery and murder of Ryan Ennis.  Beatty and Ingram testified about statements Grecco made en route to the meeting with Ennis, in which Grecco made clear that he intended to rob and would be willing to murder Ennis in order to obtain the money he needed to invest in Ingram's heroin business.  Both Beatty and Ingram also testified to their observations and actions after the murder.  Ingram assisted Grecco in disposing of a cellphone that Grecco had taken from Ennis, as well as the clothes that Grecco had worn that day.  Beatty corroborated Ingram's account and further recalled that Grecco came out of the apartment complex with a blood stain on his pants and wearing a hat that he had taken from Ennis.  She also testified regarding a conversation she had with Grecco after the murder, while the two of them were getting high.  Grecco confessed to Beatty that "it" had been easier than he thought it would be, by which Beatty understood him to mean the murder of Ryan Ennis.

  The jury also heard testimony from two of Grecco's friends: Aaron Tupin and Ryan Wycoff.  Tupin testified that on the day of the murder, Grecco came to him and inquired about borrowing a gun.  Although Tupin did not have a gun to loan Grecco, he did loan him a knife.  Despite Tupin's repeated requests, Grecco never returned that knife.  Ryan Wycoff testified regarding Grecco's prior marijuana-related dealings with Ennis.  Wycoff also testified about a conversation he had with Grecco shortly after the murder during which Grecco confessed that things had "gone south" in his relationship with Ennis and that, as a result, he could never do business with Ennis again.

  The evidence also included text messages and cellphone records for the defendant, Ennis, Beatty and Ingram.  This evidence established that Grecco traveled with Beatty and Ingram from New Jersey to Ossining, New York on August 26, 2014 and that, after meeting with Grecco, Ennis never made another phone call or sent another text message.

  The jury also saw photographs of Ennis's mutilated body and heard testimony from a medical examiner regarding the nature and extent of the knife wounds that took Ennis's life.

  On the defense case, Grecco's sister, Amber Rose Grecco, testified regarding her belief that her brother possessed a peaceful character.  Grecco himself also testified at length.  Although Grecco admitted that he had conspired to distribute marijuana with his brother Joseph and with Ennis, and that he had conspired to distribute heroin with Ingram, he denied any role in the robbery and murder of Ennis.

---

[1] Count Four also charged Grecco with conspiring to distribute and possess with intent to distribute cocaine.  The Government did not proceed to trial on this portion of Count Four.

Honorable Kenneth M. Karas
August 8, 2016
Page 4 of 10

### The Presentence Investigation Report and the Applicable Guidelines

In the Presentence Investigation Report (the "PSR"), the Probation Office calculates the offense level applicable to Grecco to be 47 based upon the following reasoning:

**Robbery and Murder of Ryan Ennis: Counts One, Two, and Five**

1. Because Counts One, Two and Five involve the same victim and two or more acts and transactions connected by a common criminal objective and constituting part of a common scheme or plan, they are grouped pursuant to U.S.S.G. § 3D1.2(b).

2. Sentencing Guideline § 2X1.1 is applicable to Count One.  Pursuant to U.S.S.G. § 2X1.1(a), the base offense level is that of the underlying substantive offense, plus any enhancement for intended or completed offense conduct, because the substantive offense was actually committed.

3. Because the underlying substantive offense was robbery, the base offense level for both Count One and Count Two would generally be supplied by Sentencing Guideline § 2B3.1. However, because the victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States, the offense level applicable to Counts One and Two is supplied by §2A1.1 (First Degree Murder).  *See* U.S.S.G. § 2B3.1(c)(1).  Section 2A1.1 is also the Guideline that applies to the Travel Act Murder in Count Five.

4. Pursuant to U.S.S.G. § 2A1.1, the base offense level applicable to Counts One, Two and Five is 43.

5. Because the defendant was the organizer of the robbery and murder plot, pursuant to U.S.S.G. § 3B1.1(c), a two-level increase is warranted.  *See United States v. Jacobo*, 934 F.2d 411, 418 (2d Cir. 1991) (upholding two-level enhancement for defendant who obtained cocaine and hired another to carry it for him); *see also United States v. McGregor*, 11 F.3d 1133, 1139 (2d Cir. 1993) ("In the usual case, obtaining the services of a participant would make one a supervisor subject to an enhanced sentence.")

6. Accordingly, the adjusted offense level applicable to Counts One, Two and Five is 45.

7. Pursuant to U.S.S.G. § 3D1.3, the combined offense level for Counts One, Two and Five is the adjusted offense level for the most serious of the counts in the group, in this case, 45.

**Count Three (Marijuana Conspiracy) and Count Four (Heroin Conspiracy)**

8. Counts Three and Four are grouped pursuant to U.S.S.G. § 3D1.2(d).

9. The conspiracy charged in Count Three involved at least 40 kilograms of marijuana.

10. The conspiracy charged in Count Four involved at least 100 grams of heroin.  Pursuant to the Drug Equivalency Tables set forth in U.S.S.G. § 2D1.1, this is equivalent to 100 kilograms of marijuana.

11. The combined drug quantity is thus 140 kilograms of marijuana, which yields a combined base offense level of 24 pursuant to U.S.S.G. § 2D1.1(c)(8).

12. However, because a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States, the base offense level is supplied by § 2A1.1 (First Degree Murder).  *See* U.S.S.G. § 2D1.1(d)(1).

13. Applying U.S.S.G. § 2A1.1, the adjusted offense level for this group is 45 for the reasons set forth above.

**Grouping**

14. Because a cross reference to another offense guideline does not constitute "a specific offense characteristic . . . or other adjustment" within the meaning of U.S.S.G. § 3D1.2(c), Counts One, Two and Five constitute a separate group from Counts Three and Four.  *See* U.S.S.G. § 3D1.2 cmt. 5, ¶ 3.

15. The two groups yield two units under U.S.S.G. § 3D1.4.  Accordingly, the combined offense level is 47.

**Obstruction of Justice**

The offense level calculation undertaken by the Probation Office does not include an obstruction-of-justice enhancement to account for Grecco's perjured trial testimony.  The Probation Office believes that "the Court is in the best position" to determine the accuracy of these statements.  (PSR ¶ 35.)  The Government's view is that an obstruction enhancement is warranted in this case.

The Guidelines direct the sentencing court to impose a two-level upward adjustment:

> [i]f . . . the defendant . . . attempted to obstruct or impede[ ] the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and . . . the obstructive conduct related to . . . the defendant's offense of conviction and any relevant conduct . . . .

U.S.S.G. § 3C1.1.  As the Supreme Court has explained, an enhancement for obstruction of justice is appropriate when a defendant "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).  Thus, the Second Circuit held in *United States v. Zagari*, 111 F.3d 307 (2d Cir.1997), that before applying an obstruction

enhancement based on perjury, the sentencing court must find by a preponderance of the evidence "that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter." *Id.* at 329; *see also United States v. Norman*, 776 F. 3d 67, 84-85 (2d Cir. 2015). "The intent to obstruct must be unambiguous. The enhancement may not be imposed if the false testimony may have been 'a result of confusion, mistake, or faulty memory.'" *United States v. Pena*, 751 F.3d 101, 105 (2d Cir. 2014) (quoting *United States v. Agudelo*, 414 F.3d 345, 349 (2d Cir. 2005)) (internal citations omitted).

On January 20, 2016, Anthony Grecco swore to tell the truth, looked squarely at the jury, and lied. He testified in no uncertain terms that he never harmed Ryan Ennis. (Tr. 902.) The jury nevertheless convicted Grecco of robbing and murdering Ennis and, in so doing, necessarily rejected his testimony. There can be no doubt that Grecco's testimony was willfully and materially false and made with the specific intent to mislead the jury and the Court. Indeed, Grecco's testimony was contradicted by the other evidence in the case, by logic, and by common sense, as the jury's swift verdict made clear. The jury verdict alone justifies this Court in imposing the obstruction enhancement, because "'[a] guilty verdict, not set aside, binds the sentencing court to accept the facts necessarily implicit in the verdict.'" *United States v. Hourihan*, 66 F.3d 458, 465 (2d Cir. 1995) (quoting *United States v. Weston*, 960 F.2d 212, 218 (1st Cir. 1992)). But even if the Court does not give the jury verdict determinative weight, given the sharp contrast between Grecco's account and the other evidence at trial, it is plain that Grecco consciously acted with the purpose of obstructing justice. On these facts, this Court can, and should, find that the obstruction enhancement applies and that, accordingly, the combined offense level applicable to Grecco is 49.

**Grecco's Criminal History Category**

With respect to criminal history category, the Probation Office has determined that Grecco has four criminal history points and that his criminal history category is III based upon the following reasoning:

1. On or about June 2, 2005, the defendant was sentenced to 36 months' probation following his conviction in Jackson County Circuit Court, Medford, Oregon, of Burglary in the first degree. Pursuant to U.S.S.G. § 4A1.1(c), this conviction results in one criminal history point.

2. On or about August 13, 2009, the defendant was sentenced to two years' probation following his conviction in Jackson County Circuit Court, Medford, Oregon, of Assault in the fourth degree. The period of probation has been tolled since June 2011. Pursuant to U.S.S.G. § 4A1.1(c), this conviction results in one criminal history point.

3. Because the defendant committed the instant offense while subject to the period of probation referenced in paragraph two, above, two criminal history points are added, pursuant to U.S.S.G. § 4A1.1(d).

Whether at offense level 47 or offense level 49, in Criminal History Category III, the Guidelines recommend a sentence of life imprisonment.

## The Appropriate Sentence

Although the Guidelines no longer play a mandatory role at sentencing, they nevertheless continue to play a critical role in trying to achieve the "basic aim" that Congress tried to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States v. Booker*, 543 U.S. 220, 252 (2005). "Pursuant to the 'remedy opinion' [in *Booker*], the now advisory Guidelines are to be considered together with the other factors set forth in 18 U.S.C. § 3553(a), by judges fashioning sentences." *United States v. Fernandez*, 443 F.3d 19, 26 (2d Cir. 2006); *see also Booker*, 543 U.S. at 261-62. Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 596; *see also United States v. Rattoballi*, 452 F.3d 127, 133 (2d Cir. 2006) (the Guidelines "'cannot be called just 'another factor' in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors and, with important exceptions, their calculations were based upon the actual sentences of many judges.'") (quoting *United States v. Jiminez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006) (en banc)); *see also Fernandez*, 443 F.3d at 33-34 ("It was not error for the [District Court] to employ the Guidelines range as a starting point and then to determine whether the arguments presented pursuant to the § 3553(a) factors warranted 'lighten[ing]' of . . . or fashioning of 'an alteration to' . . . the advisory Guidelines sentence").

The Second Circuit has recognized that "[i]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *Fernandez*, 443 F.3d at 27; *see also Kimbrough v. United States*, 128 S. Ct. 558, 574 (2007) ("We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'") (quoting *Rita v. United States*, 127 S. Ct. at 2464-65).

Section 3553(a) provides that the sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth seven specific considerations:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
>   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>   (B) to afford adequate deterrence to criminal conduct;
>   (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

  (3) the kinds of sentences available;

  (4) the kinds of sentence and the sentencing range established [in the Guidelines];

  (5) any pertinent policy statement [issued by the Sentencing Commission];

  (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

  (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

  In this case, a particularized consideration of the factors set forth in Section 3553(a) demonstrates that a Guidelines sentence of life imprisonment is necessary given the defendant's callous disregard for human life, the gruesome nature of the crime, and the defendant's propensity for violence, as evidenced not only by this case, but also by his prior conviction for assaulting a child.

  Of paramount importance in this analysis are the nature and circumstances of the offense. The facts of this case are, simply put, shocking, and are reason enough to impose a life sentence. The defendant brutally murdered Ryan Ennis, a twenty-five year old man who had no history of violence and with whom the defendant, by his own admission, was once friendly. It remains unclear whether it was a business dispute that drove the defendant to murder Ennis or whether, instead, the defendant simply needed cash to fuel his drug habit. What is clear is that this was not a crime of passion. Rather, as the evidence at trial showed, Grecco methodically planned the robbery and murder of Ennis: He did internet research about whether he could use a pillow to silence the sound of a gunshot. He sought out a gun from Aaron Tupin and, when Tupin was unable to provide one, he borrowed a knife instead. He packed a bag full of old clothes, so that Ennis would believe that he was delivering drugs and would not be tipped off to his murderous intent. And he mused in the car on the way to Ossining about killing Ennis.

  Just as chilling as the care with which the defendant planned the murder are his statements about it after the fact: his comment to Andrea Beatty that, even given his careful planning, the actual act of killing Ryan Ennis had been "easier than [he] thought it would be"; his admission to Ryan Wycoff that things had "gone south" with Ennis, and that he could never deal with Ennis again; and, most disturbing of all, the perjured testimony that he delivered at trial without a hint of emotion or a shadow of appreciation for the gravity of what he had done. These statements by the defendant do not simply demonstrate his complete lack of remorse; they highlight the callousness with which he approached the act of killing itself.

That the defendant could discuss the murder of Ennis with such detachment is particularly shocking given the brutality of the murder itself. As the crime scene photos graphically demonstrated, the defendant slashed the back of Ennis's head, separating his scalp from his skull, before attacking other parts of his body, including his legs, his abdomen, and his neck. The neck wound, which was the most serious, was so deep that the knife struck Ennis's spine, severing his carotid artery and partially decapitating him.

Of course, when a murder is committed, the deceased is not the only victim. In this case, Ryan Ennis's parents, Stephen Ennis and Cheryl Vanachte, and his sister, Kelly Ennis – who provided such powerful testimony at trial – are victims in both fact and law. *See* 18 U.S.C. § 3771(e). The defendant, by his actions, did irreparable violence to the Ennis and Vanachte families, as well as to the broader community that Ryan Ennis called home. The Government has previously provided the Court and defense counsel with letters from Ryan Ennis's parents that convey in stark and deeply moving terms the suffering that the defendant's actions have caused them. The Government expects that one or both of them will also address the Court at sentencing.

The history and characteristics of the defendant also support the imposition of a life sentence in this case. As discussed above, what makes the offense so shocking is not just the extraordinarily violent nature of the murder, but also the defendant's failure to demonstrate remorse, or indeed any emotion at all, in response to having taken another human life. More troubling still, the defendant's detached attitude was on display not just when he discussed his relationship with Ryan Ennis, but also when he testified at trial regarding his prior conviction for assaulting his own son. While the offense of conviction in that case was only a misdemeanor, the facts that underlie that conviction as detailed in the PSR are incredibly troubling. In short, in light of the defendant's violent temperament, coupled with his evident lack of empathy for those who are harmed by his actions, there is little reason to believe that a prison sentence for a term of years, even a lengthy one, could adequately deter him from future violent conduct and protect the public from future crimes that he might commit.

Finally, the goals of affording adequate general deterrence to criminal conduct and promoting respect for the law also militate strongly in favor of a life sentence. The defendant committed the most serious crime that one can commit, and he did so under circumstances that, far from supplying any form of mitigation, demonstrate an utter disregard for human life. A sentence of life imprisonment will warn the public that one who takes another life in such a horrific and ruthless manner can expect to spend the remainder of his own life in prison.

Honorable Kenneth M. Karas
August 8, 2016
Page 10 of 10

      In conclusion, for the reasons stated above, the Government respectfully submits that a Guidelines sentence of life imprisonment is warranted in this case and is the only sentence that is sufficient but not greater than necessary to serve the purposes of sentencing.

                                      Respectfully submitted,

                                      PREET BHARARA
                                      United States Attorney

                              By: /s/
                                    Michael Gerber
                                    Scott Hartman
                                    George Turner
                                    Assistant United States Attorneys
                                    Southern District of New York
                                    (212) 637-2470 / 2357 / 2562

CC:    John Calcagni, Esq. (by ECF)
         Troy Smith, Esq. (by ECF)
         Sara K. Willette, *United States Probation Officer* (by e-mail)